MARCONI WIRELESS TELEGRAPH COMPANY OF AMERICA *vs.* COMMONWEALTH.

POCAHONTAS FUEL COMPANY *vs.* SAME.

CHENEY BROTHERS COMPANY *vs.* SAME.

LANSTON MONOTYPE MACHINE COMPANY *vs.* SAME.

LOCOMOBILE COMPANY OF AMERICA *vs.* SAME.

NORTHWESTERN CONSOLIDATED MILLING COMPANY *vs.* SAME.

COPPER RANGE COMPANY *vs.* SAME.

CHAMPION COPPER COMPANY *vs.* SAME.

WHITE COMPANY *vs.* SAME.

Suffolk.     March 23, 1914. — October 7, 1914.

Present: RUGG, C. J., HAMMOND, LORING, BRALEY, SHELDON, DE COURCY, & CROSBY, JJ.

*Tax,* Excise on foreign corporations. *Constitutional Law,* Interstate commerce, Equal protection of laws. *Corporation,* Foreign. *Words,* "Permanent property."

The constitutionality of the excise imposed by St. 1909, c. 490, Part III, § 56, on certain foreign business corporations having usual places of business in this Commonwealth, which is in effect the requirement of a license fee for the privilege of doing a local business in this Commonwealth, here was referred to as already established and was reaffirmed.

Under St. 1909, c. 490, Part III, § 70, providing that a foreign business corporation aggrieved by the exaction of an excise may, within six months after the pay-

ment of such excise, maintain a petition for the purpose of showing that such excise should not have been exacted, which shall be its exclusive remedy, such a foreign corporation is not deprived of this remedy by reason of its compliance with the requirements imposed by the statutes of this Commonwealth on foreign corporations doing business here.

The provision of St. 1909, c. 490, Part III, § 56, imposing an excise on certain foreign business corporations having usual places of business in this Commonwealth, does not apply to a foreign corporation having its place of business here only for use in interstate commerce, and there is no distinction in this regard between a corporation doing a commercial or trading business and one engaged in the business of transportation.

In determining whether a commercial or trading business is interstate, it is not of decisive consequence where the contracts are made or where the title passes.

A foreign corporation is subject to the excise imposed by St. 1909, c. 490, Part III, § 56, when it transacts in this Commonwealth domestic business substantial in its essence and reasonably susceptible of separation from the corporation's interstate commerce.

The mere fact that a foreign corporation may not be able to make profits enough on its domestic business transacted in this Commonwealth to meet the excise imposed by St. 1909, c. 490, Part III, § 56, does not make the law unconstitutional as to that corporation nor exempt the corporation from the excise.

A corporation, organized under the laws of another State, which maintains in this Commonwealth stations for the purpose of transmitting and receiving for hire wireless electric messages to and from ships on the high seas and foreign countries, and which neither transmits nor receives any messages overland or in or through this Commonwealth, is engaged exclusively in foreign commerce and accordingly is not subject to the excise imposed on certain foreign corporations by St. 1909, c. 490, Part III, § 56.

A corporation, organized under the laws of another State, whose business, so far as this Commonwealth is concerned, consists of selling by contracts made in New York coal bought in other States to customers in the New England States and arranging for its transportation to them over the high seas or by rail from the State of Virginia, such sales being arranged solely through the medium of a manager and a salesman who travel to see prospective purchasers or communicate with them by telephone or letter from an office maintained in Boston, where a stenographer is employed, is engaged exclusively in carrying on commerce "among the several States" and accordingly is not subject to the excise imposed on certain foreign corporations by St. 1909, c. 490, Part III, § 56.

A corporation, organized under the laws of the State of Connecticut for the manufacture of silk and other fabrics and for the purpose of trade, which maintains an office in Boston, with one permanent office salesman and four travelling salesmen who travel throughout New England, where a stock of samples is kept and where sales are made by sample to customers who resort there in considerable numbers, the sales being subject to approval at the home office in Connecticut, from whence the goods are shipped directly to the customers, maintains a place of business in this Commonwealth not used exclusively for interstate commerce and accordingly is subject to the excise imposed by St. 1909, c. 490, Part III, § 56.

A corporation, which is organized under the laws of Virginia, manufactures machinery at its factory in Pennsylvania and maintains an office in Boston, where

there are a manager, an office manager and four inspectors, all of whom act as salesmen and sell machines on orders which become operative on acceptance at the office in Pennsylvania, and where also a stock to replace and repair broken parts of machines is kept constantly on hand, from which parts are supplied by direct sale for about half the repairs made on the company's machines in New England, the keeping and sale of this stock in Boston being an inducement to the trade to buy these machines, conducts a local business which is wholly distinct from its interstate business although it affects the profits of that business, and accordingly the corporation is subject to the excise imposed by St. 1909, c. 490, Part III, § 56.

A corporation, organized in West Virginia, having a factory in Connecticut where it manufactures and sells automobiles and occupying in Boston a large building as an office, salesroom and repair shop, where ten persons are employed in its sales and office department and twenty in its repair department and where it keeps a stock of repair parts and repairs cars of its own make and second-hand cars that it takes in exchange for cars of its own make, maintaining there also a used-car department, where it sells cars of its own and other makes that have been taken as a part of the consideration in the sale of new cars and constantly keeps a stock of such used cars for sale, conducts a local and domestic business that is separate and distinct from its interstate business, and accordingly is subject to the excise imposed by St. 1909, c. 490, Part III, § 56.

A corporation, organized in another State and engaged in the manufacture of flour in that State, which maintains a Boston office that has charge of the business of the corporation in New England and a part of New York, where sixteen travelling salesmen are employed, seven of whom are devoted to the Massachusetts trade and all of whom, although paid by the corporation, act as agents for the domestic wholesalers in soliciting orders from domestic retailers, the corporation also keeping on hand in Boston a small stock from which it makes sales for delivery in Massachusetts, is subject to the excise imposed by St. 1909, c. 490, Part III, § 56; and the motive which influences the corporation in undertaking the business of providing agents for the wholesalers and the fact that a natural result of this business may be to increase the corporation's sales to the wholesalers are immaterial circumstances.

A corporation, organized under the laws of Michigan as a holding company, its articles of incorporation stating that its business office outside the State of Michigan is at Boston, whose property consists of the shares of a foreign copper mining corporation, the shares of a foreign railroad corporation and certain mineral lands, and whose business consists in receiving monthly dividends from its shares of stock in the foreign corporations and depositing them in Boston banks, the distribution of these receipts, after payment of officers' salaries and expenses, to its stockholders by way of dividends, and the holding of its directors' and stockholders' meetings, all of which things are done at its Boston office, is a foreign business corporation having a usual place of business in this Commonwealth and is subject to the excise imposed by St. 1909, c. 490, Part III, § 56.

A corporation, organized under the laws of Michigan to mine, smelt and refine copper and other minerals and sell them, its articles of incorporation stating that its business office outside the State of Michigan is at Boston, whose product is sold exclusively through a selling agent in New York, but whose president and treasurer have their offices in Boston, where five of its seven directors re-

side and where the directors' meetings are held, the general management and control of all its business and property being vested in its directors, although they by vote entrust the exclusive management of the company's mine in Michigan to a general manager there, transacts business in this Commonwealth which is not interstate commerce and accordingly is subject to the excise imposed by St. 1909, c. 490, Part III, § 56.

A corporation, organized in another State to manufacture and sell automobiles and there maintaining its factory, which has a local and domestic business in this Commonwealth, is none the less subject to the excise imposed by St. 1909, c. 490, Part III, § 56, because after 1903 (when St. 1903, c. 437, § 75, was in force) and before the passage of the statute of 1909, which made the excise more onerous, it bought land in Boston and built on it a large building of steel, brick and concrete especially adapted for use as a garage, this not being an acquisition of permanent property which would make the imposition of the additional excise unconstitutional as a denial of equal protection of the laws within the principle of *Southern Railway* v. *Greene,* 216 U. S. 400.

RUGG, C. J.   These are petitions * brought by corporations organized under the laws of other States to recover excise taxes paid by each for the privilege of transacting business within the Commonwealth.

1. The foreign corporation tax law, St. 1909, c. 490, Part III, §§ 56, *et seq.,* has been upheld as a constitutional exercise of the power of the State after extended argument and thorough deliberation. *Attorney General* v. *Electric Storage Battery Co.* 188 Mass. 239. *Baltic Mining Co.* v. *Commonwealth,* 207 Mass. 381. *Keystone Watch Case Co.* v. *Commonwealth,* 212 Mass. 50.   *S. S. White Dental Manuf. Co.* v. *Commonwealth,* 212 Mass. 35.   On writ of error the judgments in the last two cases were affirmed in 231 U. S. 68.   The only question to be determined in the cases at bar is whether under the principles already established the several plaintiffs were subject to the excise laid upon each.   The tax sought to be recovered is strictly an excise tax and in no sense a property tax.   It is a license fee exacted from foreign corporations for the privilege of doing in this State business other than interstate commerce.   So far as any of the plaintiffs' requests for rulings seek for a re-examination or reversal of the principles established in these decisions, they rightly were denied.

2. The Commonwealth urges that each of the plaintiffs is

* Filed in the Supreme Judicial Court under St. 1909, c. 490, Part III, § 70.   All the cases were reported by *Crosby,* J., for determination by the full court.

estopped now from denying that it is within the scope and purview of this law. The ground for this contention is that each seasonably, voluntarily and without protest filed with the secretary of the Commonwealth the certificate of its condition as a foreign corporation required by § 54, and likewise appointed the commissioner of corporations its agent for the service of process in accordance with St. 1903, c. 437, § 58, and hence has acknowledged itself to be subject to the law. The principle invoked is that, where one of his own volition asks for a privilege or license, he cannot be heard to say afterward that his payment of the fee exacted was illegal and on that account seek to recover it. It relies upon *Cook* v. *Boston,* 9 Allen, 393, 394, *Emery* v. *Lowell,* 127 Mass. 138, 141, and like cases, and especially upon *Ficklen* v. *Shelby County Taxing District,* 145 U. S. 1, 24. But all these were cases where a fee was exacted in advance for a license issued for the transaction of a particular branch of business. In the Ficklen case the precise point decided was that a resident commission broker, who, after paying the required fee, had taken out a general license to do all kinds of commission brokerage for both foreign and domestic correspondents for 1887 and also had given a bond to pay in addition a percentage on all sales during that year, could not resort to the courts to compel the issuance to him of a license for the ensuing year by municipal authorities who refused because he had not complied with the bond of the earlier year on the ground that as the event had proved business had been done only for non-resident principals. The cases at bar in this respect come within the principle applied to a somewhat similar state of facts in *Atchison, Topeka & Santa Fe Railway* v. *O'Connor,* 223 U. S. 280, where it was held that a foreign corporation paying an excise tax was not acting voluntarily in a legal sense but was under implied duress when it was put to a serious disadvantage against the sovereignty by reason of liability to heavy penalties if in the end its contention for exemption should not be sustained. Severe penalties are provided by § 73 for each day's delay in filing returns, and by § 74 the business of the corporation may be enjoined, while by St. 1903, c. 437, § 60, the delinquent corporation is denied the privilege of maintaining actions in our courts. Somewhat summary remedies are given in the event of a failure to pay the tax. See St. 1909, c. 490, Part III, §§ 58, 62, 69.

The provision of § 70 under which these petitions are brought
is that relief may be had by any corporation within six months
after paying the tax, which shall be the exclusive remedy. It
does not require any preliminary protest or statement of objec-
tion before filing the petition. From all these considerations the
conclusion follows that the several petitioners are not prevented
from maintaining these petitions because they complied with
the requirements of the law as its scope was contended to be by
the officers of the Commonwealth, in order to avoid the conse-
quences of being mistaken in their own interpretation of it. The
provisions of St. 1903, c. 437, §§ 58, 60, may apply in whole or
in part to corporations engaged exclusively in interstate commerce.
*International Harvester Co.* v. *Kentucky,* 234 U. S. 579. But that
question is not now before us and does not affect the point here
decided.

3. It was said in the course of the opinion in *Attorney General*
v. *Electric Storage Battery Co.* 188 Mass. 239, at pages 240, 241,
"If the statute before us applied to the maintenance of a place
of business solely for the purpose of engaging in interstate com-
merce it would be unconstitutional. . . . We are of opinion that
the Legislature cannot have intended to include in this statute
corporations whose usual place of business is established and
maintained solely for use in interstate commerce." After that
decision St. 1909, c. 490 was enacted without material change in
this respect, from which the inference flows that the Legislature
was content with the law as interpreted by that decision. In
*Baltic Mining Co.* v. *Commonwealth,* 207 Mass. 381, at page 390
it was said, referring to the case last cited, "In our former adju-
dication upon it [the statute now under consideration] we ex-
pressed the opinion that it was inapplicable to cases where a
foreign corporation had its place of business here only for use in
interstate commerce. It is not to be inferred that the Legisla-
ture intended the statute to go beyond the constitutional author-
ity of the Commonwealth." What was said in these two decisions
was adverted to and apparently adopted in part as the basis of
decision in *Baltic Mining Co.* v. *Massachusetts,* 231 U. S. 68,
where it was stated at page 84, "and the statute, it is held,
does not apply to corporations which have places of business
for the transaction solely of interstate commerce." See also

*S. S. White Dental Manuf. Co.* v. *Commonwealth,* 212 Mass. 35, at page 46.

The contention of the Commonwealth that these sentences were not intended to apply to and do not apply to corporations doing a commercial or trading business, but only to transportation corporations, cannot be supported. The decisions in which they occur did not relate to transportation corporations but to purely business corporations. The statements cannot be treated as *dicta*, for they are used as essential links in a chain of reasoning by this court upholding the constitutionality of the statute. We regard ourselves as bound by them in interpreting and applying this statute.,

The Attorney General has argued in substance that the maintenance of] a local office solely for a purpose connected with interstate commerce is such a doing business within the State as subjects a corporation to the license fee required by this statute. Reliance in this regard is placed especially upon the words in *Pembina Mining Co.* v. *Pennsylvania,* 125 U. S. 181, at page 184, to the effect that the State has a right to exact a license fee of a foreign corporation for maintaining "an office in the Commonwealth for the use of its officers, stockholders, agents, or employees." But as was explained in *McCall* v. *California,* 136 U. S. 104, at page 112, that decision was not intended to impinge upon the equally well settled principle that "the only limitation upon this power of the State to exclude a foreign corporation from doing business within its limits, or hiring offices for that purpose, or to exact conditions for allowing the corporation to do business or hire offices there, arises where the corporation is in the employ of the federal government, or when its business is strictly commerce, interstate or foreign. The control of such commerce, being in the federal government, is not to be restricted by State authority." Expressions to be found in *Horn Silver Mining Co.* v. *New York,* 143 U. S. 305, 317, *Wolff Dryer Co.* v. *Bigler & Co.* 192 Penn. St. 466, *Davis & Rankin Building & Manuf. Co.* v. *Dix,* 64 Fed. Rep. 406, 413 and *Attorney General* v. *Bay State Mining Co.* 99 Mass. 148, 153, relied on by the Attorney General, must be regarded as subject to this limitation. In principle that question is concluded by *Norfolk & Western Railroad* v. *Pennsylvania,* 136 U. S. 114, and *McCall* v. *California,* 136 U. S.

104, when read in the light of the numerous definitions (presently· to be examined) of commerce between the States given by that court. Such a place of business in common with all others, whether of citizens or aliens, perhaps might be required to pay a license fee, but that question is not presented. The conclusion is that the maintenance by a foreign corporation of a local office solely for use in interstate commerce does not render it liable to the excise tax of the statute under consideration.

4. What constitutes "commerce . . . among the several States" within the meaning of those words in the Federal Constitution has been defined by the Supreme Court of the United States. Said Chief Justice Marshall in *Gibbons* v. *Ogden*, 9 Wheat. 1, 189, 190, "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches." In *County of Mobile* v. *Kimball*, 102 U. S. 691, at page 702 occurs this definition: "Commerce with foreign countries and among the States, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities." In *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 203, it was said, "Commerce among the States consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, and the navigation of public waters for that purpose, as well as the purchase, sale and exchange of commodities. The power to regulate that commerce, as well as commerce with foreign nations, vested in Congress, is the power to prescribe the rules by which it shall be governed, that is, the conditions upon which it shall be conducted; to determine when it shall be free and when subject to duties or other exactions." In *Robbins* v. *Shelby County Taxing District*, 120 U. S. 489, at page 497, it was said that "the negotiation of sales of goods which are in another State, for the purpose of introducing them into the State in which the negotiation is made, is interstate commerce." *Kidd* v. *Pearson*, 128 U. S. 1, 20. *Lottery Case*, 188 U. S. 321, 352, 353. *Swift & Co.* v. *United States*, 196 U. S. 375. *Diamond Match Co.* v. *Ontonagon*, 188 U. S. 82. It is apparent from this review of decisions that the interstate commerce regulation which is under the exclusive control

of Congress and which cannot be affected by any discriminatory State law, includes not merely transportation but the other inherently necessary incidents of purchase and sale of goods. Nor is it of decisive consequence in this connection where the contract is made or where the title passes. As was said in *Dozier* v. *Alabama*, 218 U. S. 124, at page 128, "But as was hinted in *Rearick* v. *Pennsylvania*, 203 U. S. 507, 512, what is commerce among the States is a question depending upon broader considerations than the existence of a technically binding contract, or the time and place where the title passed." *Caldwell* v. *North Carolina*, 187 U. S. 622. *Savage* v. *Jones*, 225 U. S. 501, 520. *Crenshaw* v. *Arkansas*, 227 U. S. 389. *Rogers* v. *Arkansas*, 227 U. S. 401. *Stewart* v. *Michigan*, 232 U. S. 665.

5. The petitioners have emphasized somewhat in argument the phrase in 231 U. S., at page 86, to the effect "that local and domestic business, for the privilege of doing which the State has imposed a tax, is real and substantial," and have sought to infer therefrom that a new limitation has been imposed upon the power of the States. This conclusion does not follow. The sentence probably was intended only as a reference to a fact which existed in the cases then before the court, although not one decisive in any respect as to the conclusion reached. But given its full force, it is nothing more than a statement that a shadow cannot be made the basis of an excise tax. But when the local and domestic business exists, then an excise may be levied. There is nothing to indicate that a comparison between the total business of the company and its local business was intended. Such a basis has never before been intimated. It is directly contrary to *Ficklen* v. *Shelby County Taxing District*, 145 U. S. 1. See also *Flint* v. *Stone Tracy Co.* 220 U. S. 107. If such a principle exists in reference to any facts, it has no relation to any of the cases at bar. The test is whether the foreign corporation transacts domestic business substantial in its essence and not by comparison, and reasonably susceptible of separation from its interstate commerce. If it does, the State can fix its own terms so far as license fee is concerned.

6. The ratio of profits on the domestic business to the license tax is an immaterial circumstance. If the license fee imposed is general in its operation and is in other respects invulnerable, the mere fact, that some foreign corporation may not be able to make

profits enough to meet it, does not render the law unconstitutional as to that corporation. The opportunity to do business subject to the protection of our laws and with all the advantages which arise from our markets and our financial and other resources, is the thing which is made the subject of the excise. *United States* v. *Singer*, 15 Wall. 111. *Flint* v. *Stone Tracy Co.* 220 U. S. 107, 166, 167.

Both upon this point and the one last discussed the petitioners rely on the statement in *United States Express Co.* v. *Minnesota*, 223 U. S. 335, 348, to the effect that if the amount of the tax is "unduly great, having reference to the real value" of the property engaged in the business, and on that in *Western Union Telegraph Co.* v. *Kansas*, 216 U. S. 1, 42, referring to a tax "not at all disproportioned to such local business." See *S. S. White Dental Manuf. Co.* v. *Commonwealth*, 212 Mass. 35, 44. These tests well may be used as aids in determining whether the general scheme of an excise statute is an honest attempt to raise legitimate revenue, or whether it is "a mere device to reach and burden the interstate commerce of the company." But when the general scheme of the statute has been upheld as not out of harmony with the Federal Constitution, then it cannot be stricken down because in a particular instance the excise may seem large. *New York* v. *Roberts*, 171 U. S. 658, 661, 663. *Pullman Co.* v. *Kansas*, 216 U. S. 56, 66, 67. *Ohio Tax Cases*, 232 U. S. 576, 592.

It remains to consider the several cases at bar in the light of these governing principles.

7. The Marconi Wireless Telegraph Company of America is organized under the laws of New Jersey. It maintains in Massachusetts near the ocean three wireless stations, each consisting chiefly of a high pole having at the top a wire or wires with bare ends, from which are sent through and taken from the air currents of electricity, whereby messages are transmitted and received. Connected with this apparatus are rooms similar to ordinary telegraph stations, for use of the wireless telegraph operators. At each station it transmits and receives wireless messages for hire to and from ships on the high seas and foreign countries. It neither transmits nor receives any messages whatever over land or in or through this Commonwealth. It has no property in the Commonwealth, except that above described.

It is plain that this petitioner is engaged exclusively in foreign commerce. Transmission of intelligence by means of the electric telegraph has been held to be commerce. *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.* 96 U. S. 1. *Telegraph Co.* v. *Texas,* 105 U. S. 460. *Leloup* v. *Port of Mobile,* 127 U. S. 640, 645. *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1. The sending of the means of education by correspondence through the mails also is commerce. *International Text Book Co.* v. *Pigg,* 217 U. S. 91. The same principle governs the transmission of ideas, thought and news by the recently discovered instrumentality which has harnessed in its service "the sightless couriers of the air" to perform between its stations without visible highway the functions previously executed by electricity only when confined to wire as a conducting medium. This petitioner transacts no business of a domestic or local nature, except such as is inseparable from and necessarily incidental to its foreign commerce. Hence it is not within the purview of the statute.

8. The Pocahontas Fuel Company is established under the laws of West Virginia. Its business is the buying and selling of coal and coke. At its office in Boston is a manager who has charge of New England business and who is paid by check from New York, a salesman and a stenographer. Records of sales are kept at the Boston office and an average deposit of $1,000 is kept in a local bank for the expenses of this office. Correspondence and telephoning respecting sales is done from this office. Customers do not come to the office, but are called upon by the salesman, who sends all orders to New York, where they must be accepted and approved before the sale takes place. Goods are shipped to customers f. o. b. Norfolk, Virginia. The local office, in making contracts for delivery in Massachusetts, arranges charter parties for boats in the customer's name. All payments by customers are made by remittances by check to New York. This company has none of its goods or property in the Commonwealth, except office furniture, and there is no treasurer here. The description of business done at the Boston office, as shown by the agreed facts, is somewhat meagre, but it does not appear to include anything more than interstate commerce. No stock of goods is kept here. There is no local shop or store as a general resort for customers and the conduct of the essential details of

trade.  It does not manufacture nor mine but buys its stock from other companies and, although not distinctly stated, it may be inferred that such purchases do not occur in Massachusetts. Its business, so far as this Commonwealth is concerned, consists of selling by contracts made in New York coal bought in other States to customers in the New England States and arranging for its transportation to them over the high seas or by rail from Virginia, solely through the medium of a manager and a salesman who travel to see prospective purchasers or communicate with them by telephone or letter from its Boston office.  That which this company does in Massachusetts seems to be rationally connected with interstate commerce.  The sole business which this company appears to carry on is "commerce . . . among the several States" as that phrase has been defined in judgments by which we are bound.  The keeping of an office and a local bank account and the employment of a stenographer are incidental instrumentalities reasonably necessary to the conduct of this interstate commerce, and hence inseparable from it.  This is not a case where the corporation by the form of its contracts or the details adopted for the doing of its business has attempted to convert into a form resembling interstate commerce that which in its intrinsic substance is local business subject to State control.  Hence, *Browning* v. *Waycross*, 233 U. S. 16, where that thing was essayed, is not in point.  This case seems to be covered in principle by *McCall* v. *California*, 136 U. S. 104; *Norfolk & Western Railroad* v. *Pennsylvania*, 136 U. S. 114; *Crenshaw* v. *Arkansas*, 227 U. S. 389; *Rogers* v. *Arkansas*, 227 U. S. 401; *Stewart* v. *Michigan*, 232 U. S. 665; *Singer Sewing Machine Co.* v. *Brickell*, 233 U. S. 304.  It follows that it is entitled to prevail in this proceeding.

9.  The Cheney Brothers Company is organized under the laws of Connecticut for the manufacture of silk and other fabrics and for the purpose of trade.  It maintains in Boston an office and salesroom with one office salesman and four other salesmen who travel through New England.  No bookkeeper is employed, no books are kept except copies and records of orders, and no collections are made.  The only deposit of funds is for the expenses of the office, amounting usually to about $250, which is sent from the treasury in New York.  The salaries of salesmen and rent of

office are paid directly from the Connecticut office. A stock of samples is kept, but no other goods. The salesmen take orders, which are subject to approval by the home office in Connecticut, and the goods are shipped directly from Connecticut to the customer. The contract of sale is completed in Connecticut, where the title passes. This description of the place maintained by the corporation in Boston, and the character of business transacted there shows something outside interstate commerce. A fixed abode has been established, which is used as the headquarters for its New England business. It is almost a necessary inference from the maintenance of an "office and salesroom" with one permanent salesman, that customers resort thither in considerable numbers for the purpose of examining samples and placing orders. It reasonably may be assumed that here also are fixed all the terms of a very substantial number of sales, and that the only thing required to complete the transaction is the bald approval by the company at its home office. It is not only a permanent home for the corporation for the carrying on of its New England sales business, but it has many of the characteristics of a local salesroom. The stock of samples kept on hand is large enough apparently to require the constant attendance of one salesman. It was said by Mr. Chief Justice Waite in *Robbins* v. *Shelby County Taxing District,* 120 U. S. 489, at page 500, "I cannot believe that if Robbins had opened an office for his business within the Taxing District, at which he kept and exhibited his samples, it would be held that he would not be liable to the tax, and this whether he stayed there all the time or came only at intervals." These words were used in a dissenting opinion. But they embody a thought by way of hypothesis which evidently was regarded as too plain to be challenged.

Five salesmen are attached to these Massachusetts headquarters; one stationed there permanently; while four others also travel throughout New England. New England is a perfectly well understood geographical term which includes Connecticut, the domiciliary State of the corporation. Since the agreed facts show that the travelling salesmen attached to the Boston office "cover" Connecticut as well as the other New England States, it follows that this local domicil is used in part at least for the transaction of business between the Cheney

Brothers Company, domiciled in Connecticut, and other residents of Connecticut. Apparently the orders from residents of Connecticut are registered, copied and forwarded to the Connecticut office of the corporation through the Boston office. Such orders may be taken by the travelling salesmen from purchasers in Connecticut or at the salesroom directly from Connecticut customers who go there in person. Plainly, the sale and delivery of goods by a Connecticut corporation to a citizen of Connecticut does not become interstate commerce merely because the order may have been transmitted through a sales agency of the corporation located in Massachusetts. This especially is true where the sale is consummated in Connecticut by acceptance of the order and the passing of the title in Connecticut, as is said in the agreed facts to be the course of business. *Lehigh Valley Railroad* v. *Pennsylvania*, 145 U. S. 192. *United States Express Co.* v. *Minnesota*, 223 U. S. 335, 341. That there is nothing inconsistent with this conclusion in *Hanley* v. *Kansas City Southern Railroad*, 187 U. S. 617, is established by *Ewing* v. *Leavenworth*, 226 U. S. 464.

Some of these circumstances singly are enough to show that the place maintained by Cheney Brothers Company in Boston was not used exclusively for interstate commerce. Combined together, they lead to the conclusion that it is not entitled to prevail in this proceeding. The recognition of the existence of the corporation in Massachusetts to the extent here shown, by permitting it to maintain an office for the general use of its employees, agents and customers and the storage and display of samples of its products, "was a matter dependent on the will of the State," who could affix to the favorable exercise of its volition the conditions set forth in the corporation excise tax law. *Pembina Mining Co.* v. *Pennsylvania*, 125 U. S. 181, 186. *New York* v. *Roberts*, 171 U. S. 658. *Reymann Brewing Co.* v. *Brister*, 179 U. S. 445. *Horn Silver Mining Co.* v. *New York*, 143 U. S. 305. *Attorney General* v. *Bay State Mining Co.* 99 Mass. 148. The record reveals nothing to bring this corporation within any of the exceptions to this general rule discussed in *McCall* v. *California*, 136 U. S. 104, *Norfolk & Western Railroad* v. *Pennsylvania*, 136 U. S. 114 and kindred cases.

10. The Lanston Monotype Machine Company, organized under the laws of Virginia, manufactures machinery at its factory in

Philadelphia, Pennsylvania. It maintains an office in Boston, where there are a manager and office manager and four inspectors, all of whom act as salesmen. The machines are all sold on orders subject to cancellation within seven days sent to the home office in Philadelphia and accepted there before becoming operative, and thence the machines are shipped directly to the purchasers, with a bill of lading delivered by the local bank to the purchaser when he makes his initial payment. Stock to replace and to repair broken parts of the machines is kept constantly on hand at the Boston office and is replenished weekly from Philadelphia. From this stock in Boston parts are supplied by direct sale for about half the repairs made on the company's machines in New England, amounting to about $12,000 per year. The keeping and sale of this stock in Boston is an inducement to the trade to buy these machines. The petitioner's competitors keep no such stock of parts. These facts show the transaction of a very considerable local or intrastate business as distinguished from its interstate commerce. While there may be economies of management or advertising advantages arising from it in conjunction with the interstate business of the company, there is no necessary or inherent connection between the two. Because the interstate commerce may not be profitable except in connection with local business does not so interlock the two that they are inseparable. The protection afforded by the Federal Constitution to interstate commerce against State excise taxation does not go to the extent of permitting one engaged in interstate commerce to compete in local business free from liability to an excise to the State merely for the sake of greater profit, or even of making the difference between profit and loss in the business as a whole. Plainly this local business of replacing broken parts is conducted in a manner wholly distinct from the interstate business. The distinction is not whether a profit is made by the conjoining and a loss suffered by separating the intrastate and the interstate commerce, but whether the nature of the business is such that the company is free to renounce the domestic business if it chooses and still conduct its interstate commerce. That which was said in *Baltic Mining Co.* v. *Massachusetts,* 231 U. S. 68, at page 86, is aptly expressive of the situation disclosed on this petition, namely, "It is apparent" that the corporation "is carrying on a purely

local and domestic business quite separate from its interstate transactions. That local and domestic business, for the privilege of doing which the State has imposed a tax, is real and substantial and not so connected with interstate commerce as to render a tax upon it a burden upon the interstate business." This case also is governed by *Attorney General* v. *Electric Storage Battery Co.* 188 Mass. 239, where the facts were nearly identical. It there was said by Knowlton, C. J., at page 241, "While the statute is inapplicable to any business or place which belongs entirely to interstate commerce, it is applicable to the defendant, a corporation engaged in interstate commerce, which has, at the same time, a place of business for other purposes. The principle has been recognized repeatedly by the Supreme Court of the United States in similar cases. *Osborne* v. *Florida*, 164 U. S. 650. *Pullman Co.* v. *Adams*, 189 U. S. 420." *Singer Sewing Machine Co.* v. *Brickell*, 233 U. S. 304.

11. The Locomobile Company of America, a West Virginia corporation, is authorized to manufacture, buy, sell and deal in automobiles and to carry on general business. Its factory is in Bridgeport, Connecticut, where its business is the manufacture and sale of automobiles. In Boston it occupies an office, salesroom and repair shop for the purpose of repairing cars of its own make and second hand cars taken in exchange for its own make. It occupies a large building and employs thirty persons, ten of whom are in the sales and office department and twenty in the repair department. Its method of conducting its sales of new cars is for orders to be taken by its Boston agent and transmitted to Bridgeport, whence cars are shipped to the Boston agent, who makes deliveries in accordance with orders. It does not appear, moreover, that separation of an automobile for a particular purchaser is made until the car reaches Boston, although no shipments of cars are made into Massachusetts "except cars used in fulfilment of orders . . . previously given and approved." In two thirds of the sales of new cars the purchaser pays the entire price in cash on or before the delivery of the car, while in the remaining third "the company accepts, as a part of the consideration, a car of whatever make, previously used by the purchaser." The company maintains at its place of business in Boston a used-car department, where it sells cars of its own and other makes

taken as part consideration in the sale of new cars.  A stock of such cars is constantly kept for sale.  The business of the used-car department for the year during which the excise in question was levied amounted to $41,000 out of a total business of $246,000 done by the company in Boston during the same period.  The petitioner also keeps in its Boston repair shop a stock of repair parts used in repairing its own make of cars whether sold in Boston or elsewhere.  The repair stock kept on hand amounts to $6,000 and the repairs made annually to $7,500.  Testimony was offered to the effect that this was the usual course of business of all automobile companies and that an abandonment of either the used-car business or the repair business would impair the sales of new cars.  This narration of facts makes it plain that this petitioner is carrying on a very considerable local and domestic business quite separate and distinct from its interstate business. The petitioner contends that this domestic business is insepar- able from its interstate commerce and hence that it is beyond the control of the statute.  It was said in *Pennsylvania Railroad* v. *Knight*, 192 U. S. 21, at 28, that "Many things have more or less close relation to interstate commerce, which are not prop- erly to be regarded as a part of it."  The repair part of this com- pany's business comes within the facts before the court in *Attorney General* v. *Electric Storage Battery Co.* 188 Mass. 239, and is con- cluded by that decision.  Moreover, the sale of second hand au- tomobiles is a business by itself.  In effect the taking of a second hand machine as part payment for a new one is an investment of part of the proceeds of the sale of the new car.  The keeping of these cars in stock and making sales from them is a domestic business and is not interstate commerce nor inseparably connected with it.  There is ground for the argument that the transactions as to the new automobiles being shipped to its agent in Boston and separated and delivered to the several purchasers there and paid for there do not constitute interstate commerce, but sales from a local stock replenished by shipments.  Apparently there is or may be no apportionment of any particular automobile until it is made by the agent in Boston, for the order may not identify a specific machine.  See *Caldwell* v. *North Carolina*, 187 U. S. 622.  But it is not necessary to discuss nor decide this point for the other branches of this company's business which have

been described are domestic and separate from this if it be assumed to be interstate. This case comes plainly within the principles established in *S. S. White Dental Manuf. Co.* v. *Commonwealth*, 212 Mass. 35; *S. C.* 231 U. S. 68.

12. The Northwestern Consolidated Milling Company is a corporation organized under the laws of Minnesota. It is authorized by its charter among other things to manufacture and sell flour. Its mills are located in Minnesota. It maintains a Boston office which has charge of the business of the company in New England and a part of New York. Sixteen travelling salesmen are connected with the office, seven of whom are devoted to the Massachusetts trade. These salesmen take orders for flour and other grain products from retailers. These orders are turned over to the nearest wholesale dealer, and the petitioner has nothing further to do with them. The situation is that the salesmen in the employ of the manufacturer are soliciting business for the wholesaler by whom they are not employed. The wholesaler fills from his stock the orders given by the retailer through these salesmen and the retailer pays him. These transactions are wholly between the domestic wholesaler and the domestic retailer. The wholesalers buy their stock from the petitioner by order to the Boston office. Such orders are sent to the petitioner in Buffalo or Minneapolis, and the goods are shipped to the wholesaler. In no case is there any approval of orders by the home office. One half of the sales from the Boston office are for delivery in Massachusetts. The petitioner keeps on hand in Boston a small stock from which it makes sales for delivery in Massachusetts. The major part of the petitioner's business in Massachusetts is furnishing salesmen to act as agents for the domestic wholesalers in soliciting orders from domestic retailers. This is in substance the business of providing agents for the wholesalers. The business done by the wholesaler and the retailer is a domestic business. The business of the petitioner is chiefly in aid of this domestic business, and partakes in no respect of interstate commerce. The motive which influences the petitioner in undertaking this business is inconsequential in determining whether it constitutes interstate commerce. The fact that a natural result may be to increase the sales of the petitioner to the wholesalers is an immaterial circumstance. It is too remote

from the actual business of the petitioner's salesmen to make that interstate commerce. Its sales of goods directly from local stock is also domestic, and not interstate in character. There is strong ground for the argument that this company also might be subject to the excise, because the orders from wholesalers are received and accepted, and the transaction in substance consummated at the Boston office. But it is not necessary to pass upon this point, because the manifestly domestic business of the petitioner of very considerable proportions renders it subject to the excise tax.

In none of the cases considered under paragraphs 9 to 12 both inclusive of this opinion is the intrastate business more intimately connected with interstate commerce than in *Allen* v. *Pullman's Palace Car Co.* 191 U. S. 171, *Pullman Co.* v. *Adams,* 189 U. S. 420, *Osborne* v. *Florida,* 164 U. S. 650, *Pennsylvania Railroad* v. *Knight,* 192 U. S. 21, *Browning* v. *Waycross,* 233 U. S. 16, in each of which it was held that the two were separable for purposes of a State excise on the domestic business.

13. The Copper Range Company is organized under the laws of Michigan. Its articles of association state that "the place where the business office of this corporation is located, without the limits of the State of Michigan, is Boston, Massachusetts." This petitioner is a "holding company" whose chief asset is stock in a foreign copper mining corporation, and it also holds the stock and bonds of a Michigan railroad and certain mineral lands. It transacts no commerce either here or elsewhere. Its activities in Massachusetts consisted in receiving monthly dividends from its stock in foreign corporations and depositing them in Boston banks, and the payment of these receipts, less officers' salaries and expenses, to its stockholders by way of dividends. Substantially its entire capital stock is owned by the Copper Range Consolidated Company, whose treasurer is also the treasurer of the petitioner. Its directors' meetings are held three or four times a year in Boston, and its annual stockholders' meeting is also held there. It declares and pays dividends several times annually. The president and treasurer are residents of Massachusetts, and it keeps its corporate records and financial books of account here. It does not appear expressly, but it fairly is inferable from the fact that its treasurer's office is here and its

accounts are kept here, that its assets also are kept here. The only question involved in this case is whether the petitioner is doing business in this Commonwealth. Apparently the main business of the corporation is conducted in Massachusetts. A holding company commonly has no business except the holding of its directors' and stockholders' meetings, the receipt of dividends and other income, the payment of its salaries and clerical and office expenses and the distribution of its profits among its stockholders. All of these functions are transacted in Massachusetts. It is significant of the view which the petitioner's incorporators had of its relation to Boston that they stated in their articles of association that its business office outside of Michigan was at Boston. It hardly could be contended that this was not a business corporation. It belongs to no other class of corporations known to the law. The performance of these functions in this Commonwealth constituted a doing of business within the Commonwealth. *McCoach* v. *Minehill & Schuylkill Haven Railroad,* 228 U. S. 295, manifestly is distinguishable. The place where these activities are carried on properly may be termed a usual place of business. Although the legal domicil of the petitioner is in Michigan, its substantial home appears to be in this State, where its essential corporate faculties are exercised. The exaction of a license fee for the transaction of these corporate functions is within the power of the State. *Pullman Co.* v. *Adams,* 189 U. S. 420, 422. *Baltic Mining Co.* v. *Massachusetts,* 231 U. S. 68.

14. The Champion Copper Company is organized under the laws of Michigan, to mine, smelt and refine copper and other minerals, and to sell the same. Its articles of association state that the "place where the business office of this corporation is located, without the limits of the State of Michigan, is Boston, Massachusetts." It owns a copper mine in Michigan, where its copper is mined. Its product is sold exclusively through a selling agent in New York which represents the petitioner only with respect to making the contracts of sale and the collections from purchasers and remitting the proceeds to the treasurer of the petitioner. Deliveries under contracts of sale are exclusively under the direction of the petitioner's treasurer. The petitioner maintains its treasurer's office in Boston for the purpose of gen-

eral direction of the deliveries of copper in accordance with contracts made by its sales agent, and for the purpose of informing its sales agent as to amounts of copper to be sold and the prices, and for the necessary bookkeeping in connection with sales and deliveries, and for the deposit of funds received from all sources in Boston and other banks, the payment of its office expenses and salaries of its officers, and the distribution of dividends among its stockholders. The president and treasurer have their offices in Boston, and five of its seven directors reside in Massachusetts, where also directors' meetings are held during the year. At such meetings reports are submitted and dividends declared and votes passed authorizing the execution of deeds, conveying rights of way and other easements in land in Michigan. The company's mine in Michigan is by vote of its board of directors under the exclusive management of a general manager resident in Michigan. But the general management and control of all the business and property of the petitioner is vested in its directors. This summary of the transactions of the petitioner in Boston shows that it is transacting business there which is not interstate commerce. The articles of association manifest a purpose to maintain a business office in Boston. The functions performed by the president, treasurer and directors are such as commonly are essential to the operation of a business corporation. A considerable portion of the business transacted in Boston relates to matters quite unrelated to interstate commerce. It may be an interesting question whether a foreign corporation can select any place attractive from financial, economic, or other reasons, and establish there the management of all its interstate commerce, and seek immunity from any license for this privilege under the commerce clause of the Federal Constitution, when there is no direct connection between such place and its interstate commerce. We do not understand that *McCall* v. *California,* 136 U. S. 104, and *Norfolk & Western Railroad* v. *Pennsylvania,* 136 U. S. 114, go to this extent. But it is not necessary to discuss this question nor to determine whether the exercise by the treasurer over the sales agent and the other instrumentalities of sale constitutes interstate commerce, *Baltic Mining Co.* v. *Commonwealth,* 207 Mass. 381, 387, *United States* v. *E. C. Knight Co.* 156 U. S. 1, because apart from these considerations the corporate activities

conducted at Boston constitute a doing of business which has no direct relation to commerce. The entire corporate potentiality dwells in the Boston office. Its executive officers are there. The responsibility for its management as a corporation rests upon those whose headquarters are there. Respecting the effects of our excise law upon such a state of facts, the language of *Pembina Mining Co.* v. *Pennsylvania,* 125 U. S. 181, at page 184, is apposite: "It only exacts a license tax from the corporation when it has an office in the Commonwealth for the use of its officers, stockholders, agents, or employees. . . . The exaction of a license fee to enable the corporation to have an office for that purpose within the Commonwealth is clearly within the competency of its Legislature." *Baltic Mining Co.* v. *Massachusetts,* 231 U. S. 68.

15. The White Company is an Ohio corporation, organized to manufacture and sell automobiles. Its manufactory is in Ohio. It admits that it has a real and substantial local and domestic business. Its petition raises no question under the commerce clause of the Federal Constitution, but it avers that it is denied the equal protection of the laws. Such protection is assured to it, by the Constitutions both of this Commonwealth and of the United States. Its contention rests on these facts. After 1903 (when St. 1903, c. 437, § 75, was in force) and before 1909 it acquired land in Boston, and built thereon a seven story building of steel, brick and concrete. It was especially adapted for use as a garage, and gasoline tanks, elevators and a turntable were installed, the total investment approximating $175,000. Adjoining property was acquired and remodelled and adapted for an automobile service station. This latter estate has not been occupied for several years, nor leased or sold, although it has been for lease or sale. The license fee exacted by the laws of the Commonwealth from foreign corporations has been made more onerous by the statute of 1909. The petitioner contends that these facts bring it within the principle established by *Southern Railway* v. *Greene,* 216 U. S. 400.

The real estate acquired by this petitioner is of a kind adapted to a very considerable and increasing business, in which there is general competition. The storage and care of automobiles and the performance of necessary service for their repair, mainte-

nance and operation is a widespread business in which large amounts of capital are invested and considerable numbers of persons are engaged. Such establishments are frequent subjects for lease and sale. There is nothing to indicate or to warrant the inference that the petitioner's investment in real estate is not readily salable at reasonable prices. It is not property of a nature irretrievably devoted to a limited and monopolistic use, and not readily available either for other valuable uses or to other persons ready to devote it to the same uses at prices fairly equivalent, subject to the general vicissitudes of business conditions, to the original investment. The Greene case related to railroad property, which is not susceptible of use for any other purpose without great loss. In that opinion it was said, "It must always be borne in mind that property put into railroad transportation is put there permanently. It cannot be withdrawn at the pleasure of the investors. . . . The railroad must stay, and, as a permanent investment, its value to its owners may not be destroyed." 216 U. S. at page 414, citing *Ames* v. *Union Pacific Railroad,* 64 Fed. Rep. 165, 177. In *S. S. White Dental Manuf. Co.* v. *Massachusetts,* 231 U. S. 68, at page 88, it was said respecting a similar contention: "The conditions existing in the *Southern Railway Co.* v. *Greene* case are not presented here. . . . We do not find in this situation an acquisition of permanent property, such as was shown in the Greene case." The facts in the case at bar are indistinguishable from those before the court in that case. "Permanent property," as these words were used in the opinion in the White Dental Company case referring to the Greene case, we interpret to mean at least a kind of property, ownership of which is inherently necessary for the establishment of the business, which must abide in the same ownership, and which cannot in the nature of things be sold in the general market so as to yield a fair return for the cost, less its normal depreciation. At all events, the Greene case does not exonerate this petitioner from liability to the excise.

Moreover, there is nothing to indicate that the purchase of real estate and the construction of a building were indispensable features of its initial admission to do business here. It is common knowledge that business like that of the petitioner often is conducted on leased property. There is a wide difference between

business of that sort and the operation of a railroad, which imperatively requires a roadbed and track.

The conclusion here reached seems to be supported also by *Hammond Packing Co.* v. *Arkansas*, 212 U. S. 322, *Security Mutual Life Ins. Co.* v. *Prewitt*, 202 U. S. 246, and *Waters-Pierce Oil Co.* v. *Texas*, 177 U. S. 28.

What has been said disposes of all the cases. It is not necessary to follow in detail the numerous requests for rulings. So far as they apply to any of the cases, the material principles to which they call attention have been discussed. Let entries be made for judgment in the several cases as follows:

Marconi Wireless Telegraph Company of America *v.* Commonwealth, *Decree for the petitioner with costs.*

Pocahontas Fuel Company *v.* Commonwealth,
*Decree for the petitioner with costs.*

Cheney Brothers Company *v.* Commonwealth,
*Petition dismissed with costs.*

Lanston Monotype Machine Company *v.* Commonwealth,
*Petition dismissed with costs.*

Locomobile Company of America *v.* Commonwealth,
*Petition dismissed with costs.*

Northwestern Consolidated Milling Company *v.* Commonwealth, *Petition dismissed with costs.*

Copper Range Company *v.* Commonwealth,
*Petition dismissed with costs.*

Champion Copper Company *v.* Commonwealth,
*Petition dismissed with costs.*

White Company *v.* Commonwealth,
*Petition dismissed with costs.*

The cases were argued at the bar in March, 1914, before *Rugg,* C. J., *Hammond, Loring, Sheldon,* & *Crosby,* JJ., and afterwards were submitted on briefs to all the justices.

*C. A. Snow,* (*W. P. Everts* with him,) for the petitioners.

*R. S. Hoar,* Assistant Attorney General, for the Commonwealth.