REMINGTON ARMS COMPANY, INC. *vs.* LECHMERE TIRE & SALES CO.

Middlesex. February 5, 1959. — April 30, 1959.

Present: WILKINS, C.J., RONAN, SPALDING, WILLIAMS, & CUTTER, JJ.

*Corporation,* Foreign corporation. *Interstate Commerce. Fair Trade Law.*

The qualification requirements of G. L. c. 181, §§ 3, 5, 12, do not apply to a foreign corporation engaged solely in interstate commerce. [136–137]

Facts pertaining to a foreign corporation engaged in the manufacture and sale of sporting firearms and ammunition and maintaining in Massachusetts the office of its New England district manager for the solicitation by the manager and other salesmen from wholesale dealers in that territory of orders which were accepted only at the corporation's home office in another State and were filled by shipments from its factories in other States, and respecting which invoices were sent from and remittances made to the home office, showed that the corporation's Massachusetts activities were exclusively in interstate commerce, although it maintained here a supply of brassards to be donated to gun clubs as advertising and made fair trade agreements with dealers here and sought fair trade enforcement in court here. [137–139]

BILL IN EQUITY, filed in the Superior Court on November 4, 1957.

The suit was reported by *Cahill, J.,* after confirmation of a master's report.

*Lane McGovern,* (*Parker D. Thomson* with him,) for the plaintiff.

*George S. Abrams,* (*Ruth I. Abrams* with him,) for the defendant.

WILKINS, C.J.  This is a suit in equity under the fair trade law, G. L. c. 93, §§ 14A–14D, to enjoin the defendant, a retail dealer, from selling the plaintiff's trade marked rifles and ammunition at prices lower than the minimum retail prices established in fair trade contracts entered into and in force between the plaintiff and various Massachusetts retail dealers.  The case was referred to a master whose report has been confirmed.  The case is reported without decision by a judge of the Superior Court.  G. L. c. 214, § 31.

Remington is a Delaware corporation engaged in the manufacture of a sporting line of firearms and ammunition which bear its trade mark, brand, or name.  By advertising it has developed a large and valuable good will.

Lechmere, a Massachusetts corporation, has a large retail establishment in East Cambridge, and is the largest discount house in New England.  In its sporting goods department Remington firearms and ammunition and similar products of Remington competitors are sold at retail.

Remington for some years has "fair traded" firearms and ammunition throughout the United States where fair trade laws existed.  It entered into retail fair trade contracts with numerous Massachusetts dealers, stipulating minimum retail prices for its products.  In substitution for previous contracts, early in February, 1957, eighty dealers executed retail fair trade contracts governing the sale of firearms, and forty dealers executed similar contracts governing the sale of ammunition.  These were executed in this Commonwealth by the dealers and at Bridgeport, Connecticut, by Remington.  Lechmere did not sign such a contract although sent a blank form.  Remington sells only to wholesale houses.  It has no company stores in Massachusetts and does not solicit or sell to the retail trade.

Lechmere's violation of the fair trade law is conceded.  Its sole contention is that the omission of Remington, as a foreign corporation, to comply with G. L. c. 181 deprives it of the right of resort to the courts of this Commonwealth.

See G. L. c. 181, § 5. Remington has not filed annual certificates of condition under G. L. c. 181, § 12 (as amended through St. 1953, c. 351), or a copy of its charter and other information under § 5, or appointed an attorney for the service of process under § 3 (as amended through St. 1955, c. 611, § 6). Remington's position is that these sections do not apply to it. Upon this affirmative defence set up in its answer, the burden of proof is upon Lechmere. *Friedenwald Co.* v. *Warren*, 195 Mass. 432, 435.

Remington's home office and principal place of business are in Bridgeport, where its ammunition is manufactured. Its rifles are manufactured at factories in Ilion, New York, and Findley, Ohio. It has no factory, plant, or warehouse in this Commonwealth, and renders no repair service here. It has maintained an office in Boston for many years. Its name is in the telephone and city directories, and appears on the building listing of tenants and on the office door. Also on the door is "Thomas F. Parker, Manager."

All the office furniture and equipment are owned by Remington. These include filing cabinets, which contain correspondence, stationery, activity reports, duplicates of orders, shipping documents pertaining to business originating in New England, and miscellaneous papers pertaining to the work of the office. The letterheads for local use bear in conspicuous type the name "Remington," a statement of its business, and the address, "Bridgeport 2, Conn." Some bear the words "District Office," others "District Sales Office," and the location in Boston. Six or seven sample guns are kept on the premises for exhibition to interested callers and for display by Parker in his field canvass of wholesale houses. With this exception, Remington does not keep or store in this Commonwealth any inventory of guns, ammunition, or spare parts. In the office there are chevrons or brassards for skeet and trap shooting which are supplied on request to gun clubs for awards to members. The only other property here is two automobiles "registered in Massachusetts with mail addresses in Boston and Bridgeport."

The office is maintained for Parker as Remington's New England district manager.  He is a resident of this Commonwealth.  The only person with full and regular time attendance at the office is a woman secretary.  Approximately one half of Parker's time is spent on the road in the various New England States.  He has the assistance of two field men, one a resident of Maine and the other of western Massachusetts.  Principally engaged in soliciting the wholesale trade, the latter call at the office infrequently, and attend three or four conferences a year at which the program for soliciting business from wholesale dealers in the New England States is discussed.  Parker swears to bills in equity brought against Massachusetts violators.  In cases instituted against violators in the Superior Court, Suffolk County, one in 1956 and the other in 1957, venue, otherwise lacking, was had by alleging that Remington had a usual place of business in Boston.

Parker's principal activity, requiring the major part of his time, is the solicitation of orders from wholesalers throughout New England.  He and his two assistants from time to time call on some of the larger retail dealers to observe the display of Remington products, feel the pulse of the trade, and check fair trade prices to be sure that they are maintained.  They discuss with those dealers any sales problems, and generally endeavor to promote good will, but they do not solicit retail business or effect sales.  On rare occasions Parker receives a complaint from a wholesaler concerning a late shipment or quality.  He generally discusses the complaint with the one making it, and tries to straighten the matter out.  In some cases he reports the matter to Bridgeport to be dealt with direct.

Every year each of Remington's wholesale customers receives a "prices and terms" sheet setting forth the terms of sale of its firearms or ammunition.  Sales are effected in the following manner:  The customer mails an order to Bridgeport, where all orders are accepted or rejected.  There an order form is made up, a copy sent to Parker, and an acceptance sent to the customer.  Shipments are made

f. o. b. the factory. No deliveries are made by, from, or through the Boston office. Invoices are sent the customer from Bridgeport. All remittances are made by the customer to Bridgeport.

The field men have instructions not to accept orders. No payments are made to, and no collections are made by, the Boston office. Parker does not intervene in an effort to induce customers to pay overdue bills. Parker and the employees are paid from Bridgeport. Few customers visit the Boston office. From time to time telephone calls seek information as to where Remington products can be purchased. These inquiries are referred to its wholesale dealers in the area.

Remington holds no meetings of stockholders or of directors in this Commonwealth. No corporate books and records are kept here. It does not advertise in Massachusetts newspapers. Its principal bank accounts are in Bridgeport. There is a $300 bank account in a Boston bank in Parker's name which is used to pay the office rent, telephone bills, postage, and petty expenditures.

Section 5 of c. 181 provides that "Every foreign corporation of the classes described in section three, before transacting business in this commonwealth, shall, upon payment of the fee provided by section twenty-three,[1] file . . . a copy of its charter . . . certified . . . by-laws, and a certificate" of certain information as to the corporate officers, meetings, and stock. For failure to comply with §§ 3, 5, and 12 officers are subject to fine and to joint and several liability "for all debts and contracts of the corporation, except such as relate to interstate commerce, contracted or entered into within this commonwealth or for the purpose of being performed therein, so long as such failure continues. Such failure shall not affect the validity of any contract with such corporation, but no action shall be maintained or recovery had in any of the courts of this commonwealth by any such foreign corporation so long as it fails to comply with said sections."

---

[1] Seventy-five dollars. For filing all other certificates and statements, including the annual certificate of condition required by § 12, $25. § 23, as amended through St. 1957, c. 698, § 18.

By § 3 (as amended through St. 1955, c. 611, § 6) "Every foreign corporation, [1] which does business in this commonwealth or [2] which has a usual place of business in this commonwealth, or [3] owns real property therein without having such a usual place of business, or [4] which is engaged therein" in certain construction work "shall, before doing business in this commonwealth," appoint the commissioner of corporations and taxation its agent for the service of process "in any action or proceeding against it." In case of noncompliance with § 3, § 3A (inserted by St. 1928, c. 98, § 1) provides that a foreign corporation "in relation to any cause of action or proceeding arising out of such business" shall be deemed to have appointed the commissioner its agent. This means business arising in this Commonwealth. *Trojan Engr. Corp.* v. *Green Mountain Power Corp.* 293 Mass. 377.

Section 12 (as amended through St. 1953, c. 351), which prescribes the filing of an annual certificate of condition, applies to "Every foreign corporation, other than one which is required . . . to make annual returns to the department of public utilities."

Other penalties may be visited under c. 181. For failure to comply with §§ 3 and 5 the foreign corporation may be enjoined from doing business (§ 19). For failure to file a certificate of condition under § 12, daily amounts may be forfeited to the Commonwealth (§ 21), and the corporation may be enjoined from doing business (§ 22).

The plaintiff concedes that it might be subject to the service of process in this Commonwealth. See *Wyshak* v. *Anaconda Copper Mining Co.* 328 Mass. 219; *Jet Mfg. Co. Inc.* v. *Sanford Ink Co.* 330 Mass. 173. Its contentions are (1) that the qualification requirements of §§ 3, 5, and 12 do not apply to foreign corporations engaged solely in interstate commerce, and (2) that it is such a corporation.

Our cases have held most definitely in accordance with the former contention. *Attorney Gen.* v. *Electric Storage Battery Co.* 188 Mass. 239, 240–241 (§ 3). *Garvey* v. *Wesson*, 258 Mass. 48, 51–52 (§ 5). *Lever Bros. Co.* v. *Commonwealth*,

232 Mass. 22, 26 (§ 12). See *Pacific Wool Growers* v. *Commissioner of Corps. & Taxn.* 305 Mass. 197, 208.[1] We have not been asked to reconsider whether in the light of subsequent decisions of the Supreme Court of the United States there should be a broadening of the scope of c. 181 on the ground that it now appears that the constitutional limitations on State legislative power could have been more narrowly construed. See *Wyshak* v. *Anaconda Copper Mining Co.* 328 Mass. 219, 223. The decisions in the first three cases cited, so far as they now concern us, were rested in the main upon legislative intent. We would not be inclined at this late date to make a retroactive reinterpretation of that intent on a matter which is largely one of legislative policy. See *Pulson* v. *American Rolling Mill Co.* 170 F. 2d 193 (1st Cir.).

The principal issue is whether the plaintiff is engaged exclusively in interstate commerce. Most of its activities have been held not to amount to more than interstate commerce. "The keeping of an office and a local bank account and the employment of a stenographer are incidental instrumentalities reasonably necessary to the conduct of this interstate commerce, and hence inseparable from it." *Marconi Wireless Tel. Co. of America* v. *Commonwealth*, 218 Mass. 558, 569. *Alpha Portland Cement Co.* v. *Commonwealth*, 248 Mass. 156, 159.[2] *McCall* v. *California*, 136 U. S. 104, 108–109. In the same category are the employment of salesmen and the presence of the six or seven sample guns. *Cheney Bros. Co.* v. *Commonwealth*, 246 U. S. 147, 153.[3]

There are two novel features of the present case. One of slight import is the supply of chevrons and brassards to be donated, as we infer, to gun clubs, which were not its customers. These trifling gifts are in the nature of advertising and are insufficient in themselves and in their man-

---

[1] Accord: *Bank of America, Natl. Trust & Sav. Assn.* v. *Lima*, 103 F. Supp. 916 (D. C. Mass.). Cf. *Canadian Pac. Ry.* v. *Sullivan*, 126 F. 2d 433 (1st Cir.).

[2] Reversed on other questions in *Alpha Portland Cement Co.* v. *Commonwealth*, 268 U. S. 203.

[3] Reversing the portion relating to Cheney Brothers Company in *Marconi Wireless Tel. Co. of America* v. *Commonwealth*, 218 Mass. 558, 569–571.

ner of distribution to amount to the doing of a local business.

The other feature is the fair trade contracts made with Massachusetts dealers. These contracts were made in protection of the good will of the plaintiff's interstate business. *Bulova Watch Co. Inc.* v. *Anderson,* 270 Wis. 21, 26. As we said in *General Elec. Co.* v. *Kimball Jewelers, Inc.* 333 Mass. 665, 669–670, "The fair trade law permits producers of trade marked commodities to protect their trade marks and good will from damage resulting from cut rate competition by fixing the prices at which their merchandise may be resold by the dealers."

Remington's fair trade enforcement methods are set forth in the master's report. Violations are reported to the manager of products at Bridgeport. A telegram to the alleged violator calls upon him to discontinue. This is followed by a confirming letter, enclosing a copy of Remington's current price contract and a price list. At the same time a letter to the person reporting the violation advises that "it is definitely the intention of Remington to strictly enforce the maintenance of fair trade prices with every means permitted by law." In most cases the alleged violator makes denial or promises to comply. If no reply is received in thirty days, another letter is sent. In many instances Parker or one of the field men gets in touch with the alleged violator and attempts to achieve compliance. Cases where continued violations are reported are referred to Remington's legal department, which hires a professional shopper, and, upon receipt of his report, refers the matter to local counsel. From time to time suits have been brought in various States. In each of the years 1956 and 1957 three suits were brought in this Commonwealth, in some of which preliminary injunctions served the purpose. In one case a consent decree was signed, and in two the defendant signed a fair trade agreement.

The activities of Parker, the field agents, or the professional shoppers are a part of the plaintiff's interstate business and a necessary prelude to court enforcement. See

*International Textbook Co.* v. *Pigg,* 217 U. S. 91; *Crenshaw* v. *Arkansas,* 227 U. S. 389. Resort to the courts similarly is not to be regarded as intrastate business. *Sioux Remedy Co.* v. *Cope,* 235 U. S. 197, 202–203.

There should be a decree enjoining the defendant in accordance with the first two prayers of the bill, with costs to the plaintiff.

*So ordered.*